SAMUEL Z. GONZALES, COLLECTOR OF REVENUE, APPELLANT, VS. DANIEL F. SULLIVAN, APPELLEE.

1. The Constitution, operative in this State in 1855, made it the duty of the Legislature to designate objects of improvement which shall constitute a State system. The Legislature in that year (January 6, 1855,) designated certain improvements as proper objects to be aided from a trust fund created by it and thus establish a system. The primary purpose of this legislation was the construction of the works belonging to the system, not the extension of aid or bounty to the corporations having the right to construct the works so designated. The aid extended by the act was the consideration to the companies, having or to have the right to construct the works, to accept the provisions of the law, thus bringing themselves within the system, subject to its control and regulations. The designation of a road "as a proper improvement to be aided from the fund" created by the act made it an improvement belonging to the system, and the acceptance of the provisions of the law by the company having the right to construct it gave the company the rights granted. Each road was, under the terms of the law, exempt from taxation during its construction and for thirty-five years from its completion. This exemption, rested in contract, was attached to the property and could not be subsequently divested by the State.

2. During the year 1855 the Legislature designated another line of railroad as a proper improvement to be aided from the Internal Improvement Fund in the manner provided for in the act establishing the system. This constituted the road a part of the system, and upon the company's acceptance of the provisions of the internal improvement act, the right of exemption from taxation attached to the road. These acts, relating to the same subject-matter, must be construed together as one act.

3. The power of one Legislature is not limited by the act of an antecedent one, unless the act of the first is of such character as to call into operation a constitutional limitation upon the power of the second. The internal improvement act is not organic law. It was subject to modification by a subsequent Legislature, whenever its power was not thus limited.

4. A prior Legislature cannot make the exercise of constitutional power and duty by a subsequent one depend upon the amount of gain which individuals may realize from private investments.

5. The owner of the equity of redemption and five-sixths of a mortgage debt, has an equity to enjoin the sale of land in which he has these interests when it is advertised for sale for a tax to which it is not subject.

Appeal from the Circuit Court for Leon county.

The case was transferred from Escambia county on account of the disqualification of the Judge of the First Circuit to hear it.

The material allegations of the bill are: That appellant, as collector of revenue for Escambia county, levied upon and advertised for sale on the sixth day of August, 1877, for State and county taxes for the year A. D. 1876, amounting to $4,826.84, the track of the railroad situated in said county known as the Pensacola and Louisville Railroad, with the locomotives, passenger, freight, and other cars, and machine shop belonging thereto; that said P. & L. R. R. is the railroad formerly known as the Alabama & Florida R. R., and was constructed by said A. & F. R. R. Co., a corporation chartered by an act of the General Assembly of Florida, approved January 8th, 1853, (Chapter 483 of Laws of Florida;) that said A. & F. R. R. with all and singular its stations, depots, buildings, engines, houses, road-bed, superstructure, track, and other improvements and constructions thereon made, and all the rights, privileges, easements, and franchises of said A. &. F. R. R. Co., were sold under a decree of foreclosure and sale rendered by the Circuit Court May 31st, 1872, and purchased by the P. & L. Company, a corporation chartered by an act of the General Assembly of Florida, approved February 4th, 1872, (Chapter 1915, Laws of Florida;) that by 18th section of the internal improvement act, (Chapter 610, Laws of Florida,) it was provided: "That the capital stock of any railroad company accepting the provisions of the act shall be forever exempt from taxation, and the roads, their fixtures and appurtenances, including work-shops, warehouses, vehicles, and property of every

description needed for the purpose of freight and passengers,
or for the repair and maintenance of the roads, shall be ex-
empt from taxation while the roads are under construction,
and for the period of thirty-five years from their comple-
tion;" that by the fourth section of an act of General As-
sembly of Florida, approved 14th of December, 1855, (be-
ing Chapter 734 of Laws of Florida) it was provided:
"That a line of railroad to be constructed from the city of
Pensacola, or any other point or points on the waters of
Pensacola or St. Andrews bay, to the north line of the
State, leading in the direction of Montgomery, Alabama,
shall be considered as proper improvements to be aided from
the Internal Improvement Fund in the manner provided by
said internal improvement act;" that the said A. & F. R. R.
Company availed itself of the benefit of said 4th section of
said act, approved December 14th, 1855, by constructing and
completing on or about July 1st, 1860, the line of railway
therein provided for, to wit: from the City of Pensacola to
the north line of the State in the direction of Montgomery,
Alabama, and by doing all other things to entitle it to all the
benefits of said 18th section of the internal improvement act,
and on the 12th day of March, 1856, the said Alabama &
Florida R. R. Company notified the Board of Internal Im-
provement of its acceptance of the terms of the internal im-
provement act, and of the provisions of the said act ap-
proved December 15th, 1855; that by an act approved Jan-
uary 15th, 1859, entitled "An act granting to the Alabama
& Florida Railroad Company alternate sections of the swamp
and overflowed lands," (being Chapter 885, Laws of Florida,)
as well as by the action of the Board of Internal Improve-
ment in setting apart to said railroad, in pursuance of said
act, its quota of said lands, the said Alabama & Florida Rail-
road was recognized and adopted as one of the roads entitled
to all the benefits of the internal improvement acts; that the
said P. & L. R. R. and the other property levied upon and

advertised for sale as aforesaid by respondent are exempt from taxation in this State until the year A. D. 1895, and said sale would manifestly cloud the title of said railroad and other property.

Injunction against selling is then prayed and general relief and subpœna.

On 3d day of August, Judge White, of the Second Circuit, granted a preliminary injunction.

The appellant Gonzales filed a general demurrer to the bill on the 28th day of September, A. D. 1870.

On December 22d, 1877, Judge White made an interlocutory decree overruling the demurrer and gave leave to answer.

Gonzales appealed from this decree.

*The Attorney-General* for the Appellant.

I. There is no provision in any of the statutes mentioned in the appellee's bill of complaint, or any other statute of Florida, which granted expressly or impliedly any immunity from taxation to the property involved in this case, as the property of the Alabama & Florida Railroad Company, nor any such immunity to the Alabama & Florida Railroad Company as a company.

A careful review of the act incorporating that company, approved January 5, 1853, (Chapter 483,) will show that there is not one line or word in it pretending or professing to grant to said company, or any of the property, any such immunity, either absolute or conditional, from taxation. The subject of taxation is not a feature of the act, and it is unnecessary to consider this act further.

The act approved December 14th, 1855, (being Chapter 734,) in its fourth section provides: "That a line of railroad to be constructed from the city of Pensacola, or any other point or points on the waters of the Pensacola bay or the

waters of the St. Andrews bay, to the north line of the State, leading in the direction of Montgomery, Alabama, shall be considered as proper improvements to be aided from the Internal Improvement Fund in the manner provided for, or (that) may hereafter be provided for in ' An act to provide for and encourage a liberal system of internal improvements in this State,'" approved January 6th, 1855.

The line from Pensacola to the Alabama line contemplated by this act being the line constructed by the Alabama & Florida R. R. Company, and that company having, as is admitted by the demurrer, given the Board of Trustees of the Internal Improvement Fund of Florida the notification of March 12th, A. D. 1856, stated in the bill of complaint, we are to inquire:

1st. Whether the fourth section of the above act of December 14th, 1855, contemplated or intended an extension to the Alabama & Florida R. R., or to any railroad that might cover the line designated by it, of any immunity from taxation embraced within the provisions of the internal improvement law, even assuming that the internal improvement law provided such immunity might be extended to a railroad covering the line designated by the act of December 14th, 1855.

2d. Does the internal improvement act provide or contemplate immunity from taxation to the line of railroad designated by the act of December 14, 1855?

In considering the first of the two propositions just submitted, we invite the attention of the court to the language of the fourth section of the act of December 14, 1855. It is, "that a line of railroad," &c., "shall be considered as proper improvements to be aided from the Internal Improvement Fund, in the manner provided for, or may hereafter be provided for, in ' An act to provide for and encourage a liberal system of internal improvements in this State,'"

.approved January 6, 1855. " To be aided from the Internal Improvement Fund " is the language. The language is. not, " to be aided as specified in the internal improvement law," nor is it a grant of the same aid, rights or immunities and privileges granted to any railroad or railroad company by the provisions of the internal improvement law, or any such language as covers all the benefits included or embraced in said law. It is merely a declaration that the line of railroad shall be considered as a proper improvement to be aided from the Internal Improvement Fund in the manner prescribed by said act, and it indicates aid from no other source than the fund, and from it only in the manner then provided for in said act, or that might thereafter be provided for. It being then the fact that it was only such aid as could come from the Interal Improvement Fund that was contemplated by the said fourth section of the act of December 14, the question that suggests itself is whether or not any such aid as immunity from taxation could emanate from the Internal Improvement Fund or the Trustees of the same? For an answer to this question we must look to the internal improvement law. From it we find that the Internal Improvement Fund consists of the internal improvement and swamp and overflowed lands granted to Florida by the acts of Congress of March 3, 1845, and September 28, 1850, with the proceeds of sales of the same and the investments made of such proceeds. Secs. 1 and 2, Chap. 610, Laws of Florida.

The Board of Trustees of the Internal Improvement Fund, in whom this Fund is vested, is a creature of statute law, and for its powers and duties in so far at least, as any question involved in this case is concerned, and for the purposes to which the fund can be applied, and as to the benefits or immunities that can emanate or be lawfully derived from the board or the fund, we must look to the internal improvement law. (Chap. 610.) So far as any railroad or

railroad company is concerned, there are but two classes of benefits or aid to which it was ever provided by the intertnal improvement law that the fund could or should be applied. These are as follows :

1st. The guarantee of the interest on the bonds issued by such railroad companies accepting the provisions of the act as had a portion of the route, as authorized by their charters, lying within the line of railroads prescribed by section 4 of the internal improvement law. Secs. 2, 3, 4 and 5.

2d. The grant of alternate sections for six miles on each side of the lines of railroad indicated by section four, and the right of way, (Secs. 15 and 28,) and of alternate sections of swamp and overflowed lands by the General Assembly under section 29.

These grants, except those to be made by the Legislature under section 29, are clearly confined to railroads lying within the lines of railway designated by said act, and, in so far as said act is concerned, extend to no other line ; and it is sufficient to state that a railroad from any point on the Pensacola or St. Andrews bay to the north boundary of the State is not within this line.

The above two classes of grants being then the only kinds of aid which could emanate from the Internal Improvement Fund, it is clear that they alone could have been contemplated by the Legislature when it enacted the fourth section of the act approved December 14, 1855. Chapter 734.

It is hardly to be presumed that the Legislature did not, within so short a period after the passage of the internal improvement act, understand what its exemption provisions were, or that such measured words as those in said "fourth section" of Chapter 734, which we have particularly called to the attention of the court, were used without a full understanding that they did not include any exemption from taxation, and could not be construed to.

They certainly, taking them in their natural import and the light of the provisions of the internal improvement law, do not involve any aid or benefit which was not to emanate from the Internal Improvement Fund, and we feel justified in assuming, even without invoking at this point any of the well-known rules of construction upon the subject of exemption from taxation, that the court will agree with us that even if the provisions of the internal improvement law were broad enough to have permitted such an exemption to be extended to a railroad covering the line designated in said act of December 14, 1855, that the Legislature did not intend by said act to bring it within the favored pale of such immunity.

In considering the second of the two propositions or questions above, we respectfully submit that the internal improvement law does not contemplate immunity from taxation to any lines of railroad other than those designated by the fourth section of that law. The Alabama and Florida Railroad's line is not within either of such lines.

The appellee contends that under section 18 of the internal improvement act the said A. & F. R. R. is exempt for the period of thirty-five years from its completion.

In the case of the Atlantic & Gulf R. R. Company vs. Allen, 15 Fla., 661, this court decided that the term "roads" in said 18 section refers to the line of roads designated in the internal improvement act. Its language is: " The term ' roads ' in this section refers strictly to the lines of road for the construction of which the Internal Improvement Fund was created." " To extend the exemption to other roads would be clearly inconsistent with the general purpose of the act." * * * It is unnecessary, after the decision of this court in the case of Holland vs. The State of Florida, 15 Fla., 455, to argue as to what that line was, or that the A. & F. Railroad's line was not a part of it.

The court having thus passed upon the meaning of the

term "roads" in said section, and by its decision having barred the way to this immunity against the said A. & F. R. R., it can alone contend for any immunity upon the ground of the first clause of said section exempting capital stock. But any such claim is equally groundless. It is the capital stock of such companies only as could legally accept the provisions of the act. For the correct meaning of the terms "company accepting the provisions of this act," we must examine the statute and ascertain if there is an explanation. Section 5 of the act provides that companies having any portion of their routes within the line designated by section 4, "shall have the right and privilege of constructing that part of the line embraced by their charter, on giving notice to the Trustees of the Internal Improvement Fund of their full acceptance of the provisions of this act, specifying the part of the route they propose to construct." From this section, as well as the whole context and purpose of the act, it is plain that only such companies as had a portion of their line lying within the lines designated by section 4 of the internal improvement law, were entitled to accept the provisions of the act, or claim any such exemption of stock, and hence the A. & F. R. R. Co. cannot claim it.

But we further respectfully submit that in the case of the Atlantic & Gulf R. R. Co. vs. Allen, 15 Fla., 660-1, this court has decided that the exemption from taxation of stock as provided by said section is not such an exemption as carries any immunity to the property of the company. The court holds that the Legislature was merely prescribing a rule of taxation, and intended only to prohibit the taxation of stock as stock. The question of the taxation of stock, as independent from the property which the stock may represent, is not involved in the present case.

There is no allegation in the bill to the effect that the Alabama & Florida Company ever received any aid of any kind from the Internal Improvement Fund other than alter-

nate sections of land; nor is it material to discuss further what aid from the fund it was entitled to under the provisions of the act of December 14, 1855, and the internal improvement law, though we respectfully suggest that it was only to the land-grant benefits of the 29th section of the latter act, and not to the interest guaranty provision. (Trustees Internal Improvement Fund vs. Bailey, 10 Fla.) The notification given by the Alabama & Florida Company to the Trustees could not create any rights which the statutes did not authorize.

We respectfully submit, in view of the above, that there never was any exemption from taxation of the A. & F. Company, or of the property in question as its property.

Chapter 885, which is an act entitled " An act granting to the Alabama & Florida R. R. Company alternate sections of the swamp and overflowed lands," approved January 15, 1859, is nothing more than a grant of the alternate sections of the swamp and overflowed lands lying within six miles on each side of the said Alabama & Florida R. R., the grant being upon the terms and conditions expressed in the 15th section of the internal improvement law. The right for the Legislature to make such a grant was reserved by the 29th section of the internal improvement law.

We respectfully submit here that no other kind of aid or grant could legally have been made by the Legislature from the Internal Improvement Fund. Trustees of Int. Imp. Fund vs. Wm. Bailey, 10 Fla., 112.

And we further respectfully submit, that if any legal force or effect is to be given to the declaration of the 4th section of the act of December 14, 1855, (Chapter 734,) to the effect that the lines of railroad named therein should be considered as proper improvements to be aided from the Internal Improvement Fund, it can only be done by construing it as meaning that a grant of the alternate sections should be made from the fund.

The only explanation that can be given of the passage of Chapter 885, if we give any force or effect at all to the 4th section of Chapter 734, is the failure of the Legislature to use explicit terms in making a declaration of their intention that such aid should be extended by the Trustees of the Internal Improvement Fund, and its subsequent determination to remove all doubt of its intention. There is nothing in Chapter 885 to base any idea or presumption of immunity from taxation upon.

The above statutes being Chapters 483, 610, 734, 885, are the only statutes passed prior to the sale of the property in question and its passing from the ownership and possession of the Alabama & Florida R. R. Company, and we can see no room for holding any other position than that the property was never exempt as the property of said company, and that said company was never so exempt.

II. The second proposition which we submit is, that said property has never been exempted from taxation in the hands of the Pensacola & Louisville R. R. Company, or the appellee, Sullivan. We make two points on this proposition:

1st. Even if it was exempt from taxation while the property of the Alabama & Florida R. R. Co., the immunity from taxation did not pass to the Pensacola & Louisville R. R. Co. or Sullivan.

2d. That no independent lawful grant of such immunity has been made since the Pensacola & Louisville R. R. Company was incorporated, or Sullivan acquired it.

As to the first point we admit that if there had been an express immunity of said railroad, independent of any particular ownership, from taxation, granted by the Legislature of Florida in the charter of the Alabama & Florida R. R. Company, or in any constitutional act passed prior to the adoption of the present constitution, an exemption from

taxation annexed by the terms which created it to the rail-road property itself, without reference to its ownership, as in the case of New Jersey vs. Wilson, 7 Cranch, 164, then the property could be claimed to be exempt; but such is not the case.

Even admitting, for the sake of argument, that the roads which are a part of the line of railroads designated by the 4th section of the internal improvement law are exempt for the period of thirty-five years from their completion, by virtue of the exemption being annexed by the terms of the internal improvement law to their corpus, irrespective of the transmutations that have or may occur in their ownership, we believe we have shown that the road in question is not a part of that system of roads, and consequently not entitled as such to any immunity from taxation as being annexed to its corpus.

On the other hand, in connection with this first point, we contend that if the appellee claims that any such immunity attached to the property as or on account of its being the property of the Alabama & Florida R. R. Company, or on account of a pretended exemption of the capital stock of that company by virtue of the provisions of the internal improvement law, (an exemption which, as before shown, it cannot legally claim,) that the immunity did not pass to the Pensacola & Louisville R. R. Company by the judicial sale mentioned in the bill of complaint, or to the appellee.

It did not pass to the Pensacola & Louisville Company—

1st. Because the judicial sale was not competent to pass such personal immunity or privilege without express statutory direction or authorization, and there was no such statutory authorization providing that such privilege should so pass, even if the immunity had ever been extended to the Alabama & Florida R. R. Company, and there was no such statutory authority. Morgan vs. Louisiana, 3 Otto, 217; Trask vs. Maguire, 18 Wallace, 391; note 23, 2 Red. on

Railways, pp. 494, 498, 500 ; 2 Red. on Railways, part 13, sec. 235, sub-division 12.

It not having passed to the P. & L. Company, it consequently has not passed to the appellee. The bill does not show how the appellee acquired his ownership. All we know is that his title is subsequent to that of the P. & L. Company. There is no statute vesting him with any particular franchises or immunities, and his position is clearly at least no better than that of the P. & L. Company. The only franchises he can claim are those essential to the operation and ownership of the road, such as to run cars, take toll, etc.

We respectfully submit, in connection with the second point, to-wit : that no independent lawful grant of any such immunity from taxation has been made since the P. & L. Company was incorporated, or Sullivan acquired it, the following proposition :

That Sec. 18 of Chapter 1915, amending the cha of the P. & L. Company, is, in so far as it pretends to create any exemption from taxation, unconstitutional, being directly contrary to Sec. 24, Art. 16, and Sec. 1, Art. 12 of Constitution of 1868.

III. As to the recognition of the exemption of the Alabama & Florida R. R. corporation involved in the 18th section of Chapter 1915, we respectfully submit that no weighty consideration can be given to it on the basis of legislative construction :

1st. Because it is not contemporaneous but is long subsequent in date, and is isolated, and it relates to a transaction which had accrued before the passage of the act.

2d. Because the attempt of that Legislature in the same section to grant an independent immunity from taxation to the P. & L. Company shows that the Legislature was either indifferent to the provisions of the Constitution of the State on the subject of such exemptions, or careless in ascertaining

them. So palpable a violation of the constitutional provision destroys its claim to any considerable respect in construing the statutes involved.

3d. Because the construction is erroneous, and the State of Florida and appellant have the right to have the decisions of the courts upon the question notwithstanding such legislative construction. Stephenson vs. Doe, 8 Blackford, 508; Feagin vs. Comptroller, 42 Ala., 516; Ogden vs. Blackledge, 2 Cranch, 272; Keyport, &c., Co. vs. Farmer's, &c., Co., 18 N. J. Eq., 13.

IV. Having discussed the particular features of the bill, we respectfully submit the following as the rule of construction of statutes governing in cases wherein exemption from taxation is claimed, and ask that they be applied to this case:

" The intention to exempt must in any case be expressed in clear and unambiguous terms; taxation is the rule, exemption is the exception. All exemptions are to be strictly construed; they embrace only what is in their terms." Cooley on Tax., 146.

" Taxation is an act of sovereignty to be performed, so far as it conveniently can be, with justice and equality to all. Exemptions, no matter how meritorious, are of grace and must be strictly construed." Cooley on Tax., 146, note 1.

" The covenant or enactment must distinctly express that there shall be no other or further liability to taxation. A State cannot strip itself of this most essential power by doubtful words. It cannot by ambiguous language be deprived of this highest attribute of sovereignty." Erie R. R. Co. vs. Pennsylvania, 21 Wallace, 499.

In this case it was held that a grant by the State of Pennsylvania to a New York corporation of the right to exercise a part of its franchises within the limits of Pennsylvania,

which State at the time of the grant laid a particular tax upon said corporation without expressly agreeing not to increase the rate or amount of taxation, did not preclude a right of further taxation of said corporation by the State of Pennsylvania.

Intendments will not be indulged to enlarge the operation of a clause restraining the exercise of a sovereign attribute of a State. As has often been said, the whole community is interested in retaining the power of taxation undiminished, and has a right to insist that its abandonment shall not be presumed in any case where the deliberate purpose of the State to abandon it does not appear. A. & G. R. R. Co. vs. Allen, 15 Fla., 658; Bailey vs. Maguire, 22 Wallace, 215; Ohio Life Insurance & Trust Co. vs. Debolt, 16 Howard, (m. p.) 427; Morgan vs. Louisiana, 3 Otto, 222; Delaware Railroad Tax, 18 Wallace, 206; Providence Bank vs. Billings, 4 Peters, 567.

In the Delaware Railroad Tax case the court say, as does our own court substantially, that "if the point were not already adjudged, it would admit of great consideration whether the Legislature of a State can surrender this power and make its action in this respect binding upon its successors any more than it can surrender its police power or its right of eminent domain."

In the Providence Bank case the court holds that a law of the State of Rhode Island imposing a tax upon the capital stock of a bank does not impair the obligation of a contract arising from its charter which contains no stipulation on the subject of taxation.

Under an exemption of school buildings, a building occupied in part for a school and in part for other purposes is not exempt. Wyman vs. St. Louis, 17 Mo., 335.

An exemption of every school-house and every building erected for the use of a collage, incorporated academy, or other seminary of learning, held not to embrace a building

occupied and used as a private boarding school. Chegary vs. New York, 13 N. Y., 220; State vs. Ross, 24 N. J., 497.

Exemption from "taxation of every kind" does not ex-exempt from an assessment for street improvements. Shee-han vs. Good Samaritan Hospital, 50 Mo., 155.

V. The only remaining question is, whether or not there was any statute of the State of Florida authorizing the assessment and levy of the tax complained of in this suit. The act entitled "An act for the assessment and collection of revenue," (being Chapter 1976 of the Laws of Florida,) authorizes the tax. Vide Secs. 47–8.

*R. L. Campbell* and *G. A. Stanley* for Appellee.

The Pensacola & Louisville R. R. Company is entitled to exemption from taxation on its road, &c., under the 18th section of the internal improvement act of 6th January, 1855. Laws of 1854, page 16.

Although unnamed in that act, it claims the benefit of it upon the following grounds:

By 4th section of act 14th of December, 1855, (Laws 1855, page 27,) a road leading from Pensacola to the State line, in the direction of Montgomery, was declared admissible into the internal improvement system.

The Alabama & Florida R. R. Co. undertook to and did build the road contemplated by the last mentioned act; and on 12th of March, 1856, did formally signify in writing to the Board of Internal Improvement its acceptance of the legislative permission to become a member of the internal improvement system.

The act of 15th January, 1858, (Laws of 1858, page 31,) recognized the Alabama & Florida R. R. as *the* railroad contemplated by act 14th December, 1855.

On the          day of                187   , the P. & L. R. R.

became the assignee by purchase of all the property, rights, franchises, and privileges of the Alabama & Florida R. R. Co.

By the 18th section of the act to amend an act incorporating the P. & L. R. R., approved February 4th, 1872, (Laws of 1872, page 85,) the Alabama & Florida R. R. is recognized as a part of the internal improvement system, and exempt from taxation; and the P. & L. R. R. as entitled to like exemption as the assignee and successor of the former.

The objection to the exemption from taxation, claimed for the Alabama & Florida R. R., rests exclusively upon the wording of 4th section of the act of 14th December, 1855, the argument being that the aid contemplated is confined to aid from the Internal Improvement Fund, but does not embrace aid in the shape of the exemptions provided by 18th section act of 6th January, 1855.

To make the objection even plausible, the 4th section of the act 14th December, 1855, must be treated as an isolated act, instead of one of a number of acts in *pari materia*, and therefore to be read as one act. Bryan vs. Dennis, 4 Fla., 485; Howell vs. Howell, 8 Fla., 46.

The declared purpose of the internal improvement act was to create a system to increase the wealth and develop the resources of the State.

The means partly of establishing that system was the aid and encouragement provided by the act, and, *inter alia*, exemption from taxation.

If, therefore, the acts of 14th December, 1855, and 12th of March, 1856, and the written acceptance filed with the Internal Improvement Board, brought the Alabama & Florida R. R. into the system, all was done that was necessary to give that road all the benefits of the system, as a consideration for its efforts to do its part towards bringing about a fruition of the system.

Bringing a road into the system necessarily implies that it is brought in to enjoy its proportion of the aids of the system, so far as they might be required.

System implies uniformity, order, rule, harmony. What kind of a system is that which gives to one what it denies to another, and yet is essential to all its constituents ?

Exemption from taxation, as well as of employees from civil duties, was as essential to the Alabama & Florida R. R. as it was to any other road in the system.

Every rule of construction, as well as every consideration of policy and duty on the part of the State, forbids the construction that the act of the 14th of December, 1855, was designed to bring into the internal improvement system a disformed member.

Such a construction would be an impeachment of the impartiality of the State in dispensing its aid amongst the co-laborers for increase of its wealth and the development of its resources.

The 18th section of the act to amend an act to incorporate the Pensacola and Louisville Railroad Company, approved February 4th, 1872, furnishes a legislative construction of the above-mentioned acts perfectly consistent with that upon which the bill is framed.

It is not contended that the last-mentioned act exempts the P. & L. R. R. from taxation; but it *is* insisted that it *is* a clear legislative recognition of the exemption of the Alabama & Florida R. R. from taxation, by virtue of legislation antecedent to our present Constitution, of the P. & L. R. R. as the assignee of the Alabama & Florida R. R., and of its exemption from taxation as such assignee.

In this aspect the 18th section of the act of 1872, above referred to, is free from the vice of unconstitutionality ; and it is, therefore, the construction which should be adopted.

In acquiring all the property of the Alabama & Florida R. R. Co., as well as its rights, franchises, and privileges,

the P. & L. R. R. Co. secured to itself, by the assignment, exemption from taxation for the unexpired period of 35 years, as one of the rights enjoyed by the former. 14 Minn., 297 ; 21 Minn., 315.

In securing the recognition of the Legislature of that assignment and the exemption resulting from it, the P. & L. R. R. Co. secured the assent of the State, which by contract had bestowed it on the Alabama & Florida R. R. Co. Atlantic & Gulf R. R. Co. vs. Allen, 15 Fla., 637.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

The Constitution, operative in this State in 1855, provided that " a liberal system of internal improvements being essential to the development of the resources of the country, shall be encouraged by the government of this State, and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law proper objects of improvement in relation to roads, canals, and navigable streams, and to provide for a suitable application of such funds as may be appropriated for such improvements." In 1855 the General Assembly, reciting this clause of the Constitution, passed an act (Chap. 610, Laws,) " to provide for and encourage a liberal system of internal improvements in this State." In the fourth section of this act the Legislature, in discharge of its constitutional duty to ascertain and declare by law proper objects of improvements, declared that "a line of railroad from the St. Johns river at Jacksonville and the waters of Pensacola Bay, with an extension from suitable points on said line to St. Marks river or Crooked river, at White Bluff, on Apalachicola bay, in Middle Florida, and to the waters of St. Andrews bay in West Florida, and a line from Amelia island on the Atlantic to the waters of Tampa bay in South Florida, with an extension to Cedar Key in East Florida, also a canal from the waters of St. Johns river on

Lake Harney to the waters of Indian river, are proper improvements to be aided from the Internal Improvement Fund."

The 5th section of the act provided that "the several railroads now organizd or chartered by the Legislature, or that may hereafter be chartered, any portion of whose routes as authorized by their different charters and amendments thereto, shall be within the line of routes laid down in section four, shall have the right and privilege of constructing that part of the line embraced by their charter, on giving notice to the Trustees of the Internal Improvement Fund of their full acceptance of the provisions of this act, specifying the part of the route they propose to construct, and upon the refusal or neglect of any railroad company now organized to accept, within six months from the passage of this act, the provisions of the same, any other company duly authorized by law may undertake the construction of such part of the line as they may desire to make, and which may not be in progress of construction under a previous charter."

The 18th section of the act provided that "the capital stock of any company accepting the provisions of this act shall be forever exempt from taxation, and the roads, their fixtures and appurtenances, includings work-shops, warehouses, vehicles, and property of every description needed for the purpose of transportation of freight and passengers, or for the repair and maintenance of the roads, shall be exempt from taxation, while the roads are under construction and for the period of thirty-five years from their completion."

A careful examination of this legislation will show that aid to railroad companies as corporations, with power to construct even the lines of railway indicated, was not its primary purpose. The constitutional provision looked to "a liberal system" as "being essential to the development of the re-

sources of the country," and its mandate of duty to the Legislature was to ascertain by law *proper objects* of improvement. In no one of these sections do we find any company named as the one to receive the benefits of the act. If the charters of any companies then existing covered any portion of the *lines ascertained and named as a part of the system*, then, without reference to any incidental benefit which might accrue to these companies, and only because a line or route embraced within their charters came within the system, such campanies became entitled to the benefits of the act upon complying with whatever, under its terms, were the conditions upon which a right to such benefits, grants, or exemptions enured or vested. They became entitled to these benefits only through the accidental fact that they had legal rights and franchises vested in them as to certain lines and routes of railway which the Legislature had, in conformity to constitutional duty, declared " proper objects of improvement." This is no where more manifest than in the section granting exemption from taxation, where the rule of taxation fixed is that there shall be no taxation of the capital stock at any time, and that as to the property, " the roads, their fixtures and appurtenances, &c., shall be exempt from taxation while the roads are under construction, and for the period of thirty-five years from their completion." This is a legislative act offering an exemption from taxation of the improvements which the State desired constructed for the time named, in consideration of the acceptance of the provisions of the internal improvement act by the company having the legal right to construct them. Whether this was a correct or wise exercise of legislative discretion, viewed in the light of public policy, is not a judicial question. We will not enter that field. The question here is one of power, not of policy. A simple reading of the internal improvement act, together with the charters of the several companies having the right to construct these roads, or

any part thereof, at the time of its enactment, will show that many additional requirements were made of them by the State through this act. Some of these were the provisions in reference to transportation of the mail, (section 23,) the limitation as to price to be paid for transportation for other roads, (section 25,) and the many requirements as to manner of construction, (section 6).

Our conclusion in reference to this branch of the subject is, that the acceptance of the provisions of the internal improvement act by these companies constituted such act, its requirements and its benefits, a portion of their several charters, that such requirements became the law of their being, and that the grant of exemption by the State was a contract between the State and the companies owning the road. (13 Wall., 264; 15 Fla., 637.) We think also that the right and privilege of exemption is annexed by the terms which create it to the property.

In the case of the State of New Jersey vs. Wilson, (7 Cranch, 164,) it appeared that the Legislature of the State of New Jersey had passed an act authorizing a purchase of lands for the Indians. The act provided that the lands to be purchased "shall not hereafter be subject to any tax." A subsequent act repealed this section granting this exemption. The questions before the court were, what was the effect of the first enactment, and the result of the second. Mr. Chief-Justice Marshall, speaking for the court, says : " The privilege, though for the benefit of the Indians, is annexed by the terms which create it to the land itself, not to their persons. It is for their advantage that it should be annexed to the land, because, in the event of a sale in which alone the question could become material, the value would be enhanced by it." So here, the privilege, the exemption, is annexed to the road itself. We have before said this legislation is throughout as to the roads and their construction. True, the companies are the agents through which their

construction is to be accomplished, but benefit to these companies is the incident; the construction of the road, the completion of the system, the principal.

With these views as to the effect and purpose of this legislation, we next inquire, was the road owned and constructed by the Alabama and Florida Railroad Company extending from "Pensacola bay to the north line of the State leading in the direction of Montgomery, Alabama," a road to which this exemption attached, either by the act of January 6, 1855, or the act approved December 14, 1855, and the subsequent acceptance of the provisions of the act of January 6, 1855, by that company? It is very clear that this road is not embraced in the act of January 6, 1855. The State insists that no road not designated in the fourth section of the act of January 6, 1855, could have become entitled to the benefit of this exemption, and in support of that position calls our attention to the language used by this court in the case of the Atlantic and Gulf Railroad Company vs. Allen, (15 Fla., 651.) We there said : " The term ' roads ' in this section (the 18th) refers strictly to the line of road for the construction of which the Internal Improvement Fund was created, and this line of road, a branch road from Live Oak to Lawton, was not embraced therein. To extend the exemption to other roads would be clearly inconsistent with the general purpose of the act, which was to encourage the system created by it, in which system the branch road was not embraced." This view, as applicable to the case then under consideration, was correct. There was no pretence that any act of the Legislature ever made or constituted the branch road from Live Oak to Lawton a proper improvement to be aided from the fund. The question in that case was whether that road, because it was at one time owned by a corporation owning the line of road from Tallahassee to Lake City, was exempt from taxation by virtue of the stock clause of the 18th section. We held not,

and that the exemption belonged only to the roads designated in the 4th section. We had in mind at the time nothing except the internal improvement act. With that as the only law on the subject before us, what we said was correct. As the author of that opinion, however, I do not hesitate to say that the language, unless controlled in reference to the facts then in view and the statutes being construed, was too broad and general. The points in that case were different from those in this. That cannot determine this. To the extent that what is there said covers the new questions here, viz: the extent of the power of the Legislature in December, A. D. 1855, to designate another improvement and give it exemption, and the construction of the act of December 14, 1855, viewed in connection with the act of January 6, 1855, it is mere *obiter* and cannot control. The same is likewise true of the case of Holland vs. The State, (15 Fla., 529.) We had there before us no other statute except the internal improvement act and the act incorporating the J., P. & M. R. R. Co.

Chapter 934, (laws,) is an act to facilitate the construction of the various lines of railroad provided for by the act entitled " an act to provide for and encourage a liberal system of internal improvements in this State," approved 6th January, 1855.

The 4th section of that act provides " that a line of railway to be constructed from the city of Pensacola, or any other point or points on the waters of Pensacola bay, or the waters of St. Andrews bay, to the north line of the State leading in the direction of Montgomery, Alabama, shall be considered as a proper improvement to be aided from the Internal Improvement Fund in the manner provided for, or may hereafter be provided for, in an act to provide for and encourage a liberal system of internal improvements in this State, approved January 6, 1855."

Two questions arise here: What is the effect of this sec-

tion, considered with reference to antecedent legislation, and did the Legislature have power to enact it, in view of the provisions of the antecedent act of 1855? It is insisted that the aid which is derived under the exact terms of this act can come only from the Internal Improvement Fund, and this is true; but it is also true that a road by law entitled to avail itself of the aid extended to other roads for their construction becomes, like them, under the act of 1855, a part of the internal improvement system. The aid here granted was to be " in the manner provided for " in the act of January 6, 1855, and this road, when it accepted the aid extended, must necessarily have placed itself, and did place itself, under the conditions upon which that aid was extended in the act, as it accepted it as provided in the act.

The 4th section of the act of 1855 did no more than designate the lines therein named " as proper improvements to be aided from the Internal Improvement Fund in manner as hereinafter provided." This made them a part of the system.

Granting the power of the Legislature, (the view in which we are now considering the matter,) we have here, within less than twelve months after the passage of the act of January 6, 1855, another act designating this road " as a proper improvement to be aided from the Internal Improvement Fund, in the manner provided by the act of January 6, 1855." If the one provision made a road a part of the system, how can it be that the other does not? Going back to the Constitution itself, it is clear that what was to constitute a particular work an improvement belonging to the system, was a legislative declaration that it was " a proper object of improvement."

It is said also that while this road may be entitled to aid from the Internal Improvement Fund under the act of December, 1855, it is not entitled to exemption from taxation, as that is something different and distinct from such aid, and can

result only from a clear grant by the State. This is true, and it is likewise true that the internal improvement act of 1855 did no more than designate certain lines of road as proper improvements to be aided from that fund. The exemption of no road resulted *ex vi termini* from the internal improvement act. This being done as an inducement to the company or corporation having the right to construct roads belonging to the system, the 18th section of the act provided that the roads, &c., should be exempt upon the *company's accepting the provisions of this act.* The exemption resulted from two facts; first, being designated as a proper object of improvement, and, second, the acceptance by the corporation owning the road thus designated of the provisions of the act, and bringing itself under the rules of construction and other regulations of the act.

So in reference to this line of road. Under the act of December 14, 1855, it became a part of the system. It became a road within the language of the 18th section. That fact existing, upon the acceptance of the provisions of the act by the company having the right to construct the road, the right of exemption, during construction and thereafter for thirty-five years, enured as a right resting in contract, and as attached to the road as a road, and not simply because it was the property of one corporation or another. These two acts are in *pari materia.* They concern the same subject-matter.

The rule of construction, as announced repeatedly by this court, is that such statutes must be construed as one act. This being the rule, we cannot see how any other conclusion can be reached. The whole question is, did this road become a part of the system? If it did, then antecedent legislation as to roads embraced in the system, being in reference to the same subject-matter, become as much applicable to the road last made a part of the system as the one first made so.

The next question is, did the Legislature have power to enact this law ? In this connection our attention has been called to the case of The Internal Improvement Fund vs. Bailey, 10 Fla., 113. That case was decided in 1862, about eight years after the passage of the internal improvement act. The Legislature in January, 1861, passed an act to improve the navigation of a river, and directed the cost to be paid from the Internal Improvement Fund. A holder of bonds, before that time issued under the third section of the act, sought to enjoin such appropriation of the fund, and the court held that he was entitled to such injunction. The ground of its action was that the measure of the right of the holder of the bond was the act of 1855 ; that upon a sale of the bonds therein authorized rights became vested, a contract was brought into existence ; that the terms of the law measured its obligation, and that the act, appropriating funds for the improvement of a river, was a violation of the contract, in that it diverted a portion of the funds pledged for the payment of the bond contrary to the terms of the law.

If it be admitted that all of this is true, and we think it is, it does not follow here that the act of December, 1855, was in violation of any right of a bondholder. For while in 1861 it does appear from this case that there was a bondholder, *non constat*, but that there was none in December, 1855, the date of the act here in question. That case is authority for the position that an antecedent bondholder can set aside or enjoin an appropriation of the fund for any purpose to which it was not applicable at the time that his right as a bondholder attached. That was the true question in the case. The equity of the bondholder, the *cestui que trust*, was held effective to restrain and limit the power of the trustee to the terms of the law as it was when his right accrued and when the obligation of his contract attached. But the present case is here upon a demurrer to a bill. No

where in the bill is the existence of a bondholder at any time stated. This, as a matter of course, is a fact of which we cannot take judicial notice, even if it existed at the date named, and if it be any defence by this officer to set it up, he must do so by way of answer. It does not appear from the bill. In what way, however, the equity of a bondholder can be made effective by the State in this matter we cannot see. That, however, is not a question before us at this time.

In the discussion of the case of the Trustees of the Internal Improvement Fund vs. William Bailey, 10 Fla., 125, the court, while admitting the power of the Legislature to designate more objects of improvement than were designated in the 4th section, remarked that " the General Assembly took a wise view of the Constitution, and, therefore, designated in the beginning only a few grand objects, vital to the whole State for improvement, leaving others to wait for their share of State aid until those first inaugurated should have passed successfully through the fiery ordeal of their difficult and doubtful struggle into existence." After naming what the objects designated by the act of 1855 were, the court again says : " After these roads should be built and prove a success, by being able for five consecutive years to pay six per cent. on the capital stock paid in and the interest on the bonded debt, and one per cent. yearly on a sinking fund on said debt, then, as provided by section 27, the Trustees of the Internal Improvement Fund may apply, under the direction of the Legislature, the annual income arising from said fund to other purposes of internal improvement, &c. So it will be seen *that it was not the design to absorb the whole fund* in aiding the designated improvements to the exclusion of all others, but only to postpone all others until those first designated should have been put into successful operation. This, we clearly think, the General Assembly had a right to do."

We have inserted this language of the court in full in

order that the effect given to the 27th section of this act by
it in that decision may be clearly seen.   The court here sim-
ply say that the Legislature had the right to designate some
objects of improvement to be constructed first, and to post-
pone others.   While this may be true of this Legislature, it
is also true of a subsequent Legislature that its powers were
not limited by the powers of the first, unless the act of the
first was of such character as called into operation a consti-
tutional limitation, and something more than a simple ante-
cedent exercise of legislative power stood in the way of the
exercise of the powers of the subsequent one.   The internal
improvement act is not organic law, and the power of one
Legislature is no greater than another.   Where the power
of the subsequent one is limited, it results from the fact that
the act of the first is of such character that the organic law
renders it inviolable through constitutional limitations cov-
ering the subject.   It may be true, as to this 27th section,
that such portion of it as provides that the fund shall pay
deficiencies in the interest account is a contract, when viewed
in reference to a bondholder.   This was perhaps a part of
the contract with him, as it was defined by this court in the
case of the Trustees of the Internal Improvement Fund vs.
Bailey, but we cannot see that such is the case with the re-
mainder of the section, whether viewed in reference to the
State, to the Trustees, to the companies, or the bondholders.
This section is nothing more than a legislative declaration
as to what the Trustees shall do under the direction of a
subsequent Legislature, in the event the railroad companies
pay for five years six per cent. on the capital stock, the in-
terest on the bonded debt, and the sinking fund.   The pro-
vision that the *railroad companies indicated by the internal
improvement act* shall for five years pay six per cent. on
their capital stock, before the annual income arising from
the fund is to be applied to some other purpose, if a con-
tract, is a contract with the companies or the stockholders.

We are not prepared to say, and cannot say, that it was within the power of that Legislature to agree with the stockholders of every private corporation embraced in this system that nothing further should be done with the Internal Improvement Fund than was provided in that act until *the stock of each stockholder in these corporations should yield him six per cent.* This Legislature could not make the exercise of the constitutional functions and powers of a subsequent Legislature in reference to the great public trusts attached to these grants conditional upon the fact that the private investment of A., B. or C. should yield him one, two or six per cent. This Legislature, notwithstanding the constitutional limitation as to pledging the *faith and credit of the State*, might, in consideration of a company agreeing to construct a road a part of the system, pledge to the holders of the bonds of the company a part of the public domain applicable to such purpose, and such legislation may be had as to attach to such a grant a constitutional limitation, but one Legislature cannot agree with a stockholder in a railroad company, that unless his stock yields him six per cent., a subsequent Legislature shall not discharge its constitutional legislative duties as to lands which the State holds by virtue of grants from the Federal Government. It might just as well attempt in the charter of a corporation to contract that unless the stock yielded an income of six per cent. a future Legislature should not have power to establish rules of property or to perform the usual functions appertaining to the legislative branch of the government. The legislative power of the State was in this Legislature for the time fixed as the term of office of the persons belonging to that department of the government. The Constitution provided that after that time this legislative power should be in other persons, and this Legislature could pass no law in derogation of this constitutional grant of power to Legislatures following.

In discussing this subject we must recollect the distinction between legislation, which, under the Constitution, amounts to a contract, such as grants of exemption from taxation based upon a consideration.   These have been held by the Supreme Court of the United States to be matters lying in grant—things as to which a contract may attach.   But the power of the Legislature in reference to an acknowledged continuing public trust and power cannot be limited by accidental circumstances based upon the amount of gain realized from private investments.   17 Geo., 56 ; 7 Conn., 585 ; 5 Conn., 538 ; Cooley's Con. Lim., 125–27.

We conclude from what has been said that upon the face of the bill in this case this road was a part of the internal improvement system.   That an exemption from taxation resting in contract is annexed, by the terms of the law which created it, to the *road itself, not to the companies,* and that there is nothing on the face of the bill from which the existence of any bond, bondholder, or other thing preventing the power of amendment in the Legislature in December, 1855.   In other words, in this bill as demurred to, we can see nothing from which any limitation upon the power of the Legislature of December, 1855, is to be inferred.   No limitation as to antecedent contracts operating at the time, so far as this bill discloses, we think the power was clear. While remarking this, we wish it to be understood that we say nothing as to its legal effect, if the then existence of a bondholder is alleged and proved by this officer in his answer.

The next point we notice is that the Pensacola & Louisville Railroad Company is not entitled to this exemption.

The bill alleges that the road was sold under a first mortgage, and that it was purchased by the Pensacola & Louisville Railroad Company.   The charter of the A. & F. Company gave it authority to borrow money to carry into effect the objects of the act, and to pledge the property of the

Company for the payment of the same. This gives the power to execute a mortgage of the road, its fixtures, and all the property named in the 18th section of the internal improvement act. 11 Ala., 437; 10 Ohio, 372; 28 Ala., 321 : 3 Md., 305 ; 3 Dutcher, 221; 1 H. & M., 726 ; 2 Red. on Railways, §235.

A sale under such a mortgage, therefore, passed the property if the purchaser had the right to purchase. The purchaser, the Pensacola & Louisville Railroad Company, under its charter, had the right to purchase this property, as it was the line of road that it was authorized to construct and operate, and with reference to which it was invested with the general power to purchase. This road thus having acquired the property, the Legislature in 1872 recognized that it had become "the assignee of the Florida & Alabama Railroad, and the franchises of the said corporation," and that it was in possession of and operating the said line of road. The Legislature also gave it the express power to purchase any other railroad. This company, under its charter, had the power to borrow money and to pledge the property of the company for its payment. So far as the right of complainant here is concerned, it is based upon the allegation of the fact "that he is the owner of the equity of redemption of the said Pensacola & Louisville Railroad Company, as well as of all the other property levied upon and advertised for sale by the collector of revenue." In addition to this he alleges that he is "the owner and holder of 532 of the 600 bonds of $1,000 each, to secure which said Pensacola & Louisville Railroad, and all the above mentioned property, as well as its rights, privileges and franchises, are now under mortgage." These facts are admitted by the demurrer.

This bill states enough to show and trace a right to this property in the complainant. It shows, at any rate, such an interest as gives him a standing in a court of equity to enjoin the collection of a void tax. It is not material to

enquire here whether in any of these sales the franchise to be a corporation, or the franchise to operate the road and collect tolls, which are usually held to be appurtenant to the shares, passed to the vendee. The property passed and with it as an incident went the exemption.

While we have examined this question of title in this case, yet we do so in the absence of any point being made in reference thereto, and because in any event our conclusion is the same. We are inclined to the view that upon an allegation of title based upon a judicial decree in a proceeding like this in equity, we should not in this collateral way examine the basis of such decree, or review the questions which the court necessarily passed upon in the exercise of its jurisdiction, nor is this any way to try a right to franchises. We are also inclined to the view that the officer here having advertised this property for sale as the property of the P. & L. Co., is estopped from alleging that it is not its property in this contest. The officer advertises it as the property of the P. & L. Co. Such a levy upon property in the possession of A. as the property of A. cannot be defended by alleging that it is the property of B.

The decree is affirmed.

The foregoing opinion was read at the January Term, A. D. 1878, but leave to file a petition for a rehearing having been thereupon granted the appellant, judgment was suspended and the case continued.

On the 15th day of April, 1878, within the time allowed by the order of the court, the appellant filed the following petition for a rehearing:

*To the Honorable Justices of the Supreme Court:*

Your petitioner, the appellant above named, respectfully represents unto your honors that by the opinion rendered in the above stated cause at the January Term, A. D. 1878,

of said court, the order appealed from, overruling the appellant's demurrer to the appellee's bill of complaint stands affirmed. That by said opinion it is held that the railroad in question was made or became a part of the internal improvement system by the act approved December 14, 1855, (Chapter 734, Laws of Florida,) and as such is entitled, upon the showing made by the bill of complaint, to the benefit of immunity from taxation granted by the 18th section of the "internal improvement law," (Chapter 610) to the "roads, fixtures, &c.,". within the line designated by section 4 of Chapter 610.

Your petitioner respectfully submits that in this position there is error, and that if given an opportunity he believes he can satisfy the court that while it was the intention of the Legislature that the road in question should receive the aid derivable from the Internal Improvement Fund, it should not have the exemption from taxation.

The language used in the 4th section of Chapter 610, as to the lines of railroads named therein, is as stated by the court in its opinion that those lines " are proper improvements to be aided from the Internal Improvement *Fund* in the manner as hereinafter provided." This section we submit has no efficacy in granting any immunity from taxation except to explain what roads are referred to by the term " roads" in the 18th section. It does not indicate that any grant but such as is derivable from the Internal Improvement *Fund* will be found in the act, but it does include within its scope improvements not included within the scope of the 18th section, to wit: the Indian River Canal. Without the 18th section there would be no basis upon which any road could base a claim to exemption from taxation, and the fact that this 18th section does not include within its scope the properties necessary to a successful operation of the canal, shows how partial the Legislature was to the lines of railroad indicated by the 4th section.

These lines being once constructed under the provisions, and according to the requirements of the act, the exemption from taxation resulted *ex vi termini* from the terms of section 18, because they were the roads referred to in said section.

The doctrine of *in pari materia* should not, we respectfully contend, be held to enlarge the apparent meaning of the terms of a subsequent act in a case like the present, if in any at all. Clearly the language of section 4 of Chapter 734, like the language of section 4 of Chapter 610, does not include within its natural meaning any kind of aid not derivable from the Internal Improvement *Fund*. To the extent of ascertaining what the aid derivable from such fund contemplated by section 4 of Chapter 734 is, and how and upon what terms it is obtainable under the provisions of Chapter 610, these two acts are to be construed as one, but that where the later of two acts by its language includes or proposes to extend the benefit of but one of two kinds of aid derivable from different sources provided by the anterior act, this doctrine of *in pari materia* is to be invoked to stretch the later act beyond the plain meaning of its terms and make it include both kinds of aid, cannot be maintained. This we contend is what has been done by this court in this case, and by it the 4th section of Chapter 734 is made to convey a benefit which its language does not include. If the 4th section of Chapter 734 had simply stated that the road in question was a proper improvement to be aided to the extent of the bond endorsement, guaranteeing interest in the manner provided by Chapter 610, the two acts would not be construed *in pari materia* or as one act, except as to the bond endorsement provisions, and on the same principle we contend that Chapter 610 and section 4 of Chapter 734 are to be construed as one act only to the extent that each relates to the aid which is derivable from the Internal Improvement *Fund*. It is only to this extent that both relate

to the same subject. The language used shows that it was not intended by the Legislature to make this road the recipient of all the benefits offered by Chapter 610, and there is nothing more unreasonable or partial in its thus treating this road than in its treatment of the canal on the subject of taxation. Exemption from taxation is founded in partiality and favoritism. That it was not the understanding of the Legislature that this road was made a part of the so-called "system" is shown by Chapter 776, section 2, where the U. S. land grant of May 17th, 1856, to the State is conferred upon the Alabama and Florida Railroad Company. Section 21 of Chapter 610 secured and pledged these lands to the roads within the "system" designated by section 4 of Chapter 610, and if it had been the understanding of the Legislature that Chapter 734 conferred upon this road all the benefits of the system, the 2d section of Chapter 776 would have been deemed unnecessary, and would not have been passed. The theory of its being a part of the system, and therefore entitled to all benefits and immunities, should not be given much weight in the face of the language of Chapter 734, section 4; and whether the railroads and canal, or the means and manner of dispensing aid, are to be considered the "system," there is no reason why the Legislature could not, in enlarging the objects of aid, confine the aid to such only as could be derived from the *fund*. The Legislature of December, 1855, had the internal improvement act before it. That act in its 4th section declared certain lines of railroad "to be proper improvements to be aided from the Internal Improvement Fund in the manner as hereinafter provided." Certain sections in that act prescribe the kind of aid to come from that fund and the manner in which it is to be extended. A certain other and distinct section grants those lines of road a character of aid which cannot come from the *fund*. Knowing what this act was, the Legislature of December, 1855, says that the line of

road in question in this suit shall be considered as proper improvements to be aided from the fund in the manner provided by Chapter 610. The language used shows, we respectfully submit, that it was never intended to grant the immunity from taxation or to make this road a beneficiary of all the kinds of aid which Chapter 610 had prescribed for the other lines.

In consideration of the premises your petitioner prays that he may be fully reheard upon the points above stated, and to that end, and that full justice may prevail, your honors will grant a rehearing in this cause.

MR. JUSTICE WESTCOTT delivered the following opinion denying a rehearing at the June Term, A. D. 1878.

We have examined the petition for a rehearing in this suit. The first position taken is that the 4th section of Chapter 610, the internal improvement law, has no efficacy in granting any immunity from taxation, except to explain what roads are referred to by the term roads in the 18th section of said act. With this view the court does not differ. As a matter of course the Legislature could then only refer to existing legislation, but what were its subsequent powers? The conclusion of the court was that subsequent legislation in terms relating to the same subject-matter gave this road the same rights that other roads had by being embraced in the 4th section. That this legislation made it a part of the system by precisely the same method as the prior legislation made the roads named in the 4th section a part of the system, and that being a part of the system, and accepting the provisions of the act, the immunities of the 18th section followed. Whether a canal designated by the 4th section, and not mentioned in the 18th section, is or is not exempted is a question, the relation of which to the matter here involved we do not see. If such canal is not exempted,

it is simply because the exemption is granted to roads and not canals. This in no way affects the question whether the Legislature has not by subsequent legislation given this road the standing that other roads had under the 4th section; in other words, made it a part of the system.

The language of the act is restricted, it is contended, to aid from the Internal Improvement Fund. This is true. So is the language of the 4th section of Chapter 610 so restricted. The conclusion of the court is that in view of the language of the Constitution and of the Legislature in the 4th section of Chapter 610, the designation of certain roads to be aided from the Internal Improvement Fund constituted them a part of a system, and that companies constructing such lines of road, or were designated proper improvements to be aided from the fund, could, upon the acceptance of the provisions of the act, become entitled to the exemptions specified as to their road. Now it cannot be denied that a road became a part of the system if it was entitled to the benefits of the fund, and became by virtue of its authorized acceptance of the provisions of the act subject to the regulations of the system. This road was designated a proper object of aid from the Internal Improvement Fund in the manner provided for in the act of 1855. Looking to that act, (section 5) one of the conditions upon which the aid was to be granted was a full acceptance of its provisions. This the road has done, and we cannot see how we are to hold that it does not accept and become entitled to this exemption when the 18th section provides expressly that the capital stock of any company accepting the provisions of this act, and the roads, shall be exempt unless the general rule of construction which has controlled us, viz: that acts in *pari materia* must be construed together, is erroneous, or we have made an erroneous application of it.

We understand this to be the rule as to all statutes whether penal, remedial, or of any other character. True,

the degree of strictness to be observed in their construction, looking to the liberty of the citizen on the one hand and the enforcement of his civil rights on the other, is different. It is very evident that two statutes relating to the same subject cannot be construed separately.

We have given this subject all the attention we can. Our views expressed in the opinion in this case are the result of careful examination, and we cannot contemplate a change without doing violence to the rules of law which in our judgment control the subject.

A rehearing is denied.